## *PRELIMINARY PRINT*

# VOLUME 604 U. S. PART 1

### PAGES 115–139

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

### FEBRUARY 21, 2025

Page Proof Pending Publication

## REBECCA A. WOMELDORF

### REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## REPUBLIC OF HUNGARY ET AL. *v.* SIMON ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 23–867.   Argued December 3, 2024—Decided February 21, 2025

The Foreign Sovereign Immunities Act of 1976 (FSIA) provides foreign states with presumptive immunity from suit in the United States.   28 U. S. C. § 1604.   To sue a foreign sovereign in United States courts, plaintiffs must satisfy one of the exceptions to immunity set forth in the FSIA.   The FSIA's expropriation exception permits claims when "rights in property taken in violation of international law are in issue" and either the property itself or any property "exchanged for" the expropriated property has a commercial nexus to the United States. § 1605(a)(3).

Respondents, Jewish survivors of the Hungarian Holocaust and their heirs, sued Hungary and its national railway (MÁV) in federal court, seeking damages for property allegedly seized during World War II. Respondents' complaint alleged that Hungary and MÁV liquidated the expropriated property, commingled the proceeds with other government funds, and later used funds from those commingled accounts in connection with commercial activities in the United States.   The District Court determined that this "commingling theory" satisfied § 1605(a)(3)'s commercial nexus requirement.   The D. C. Circuit affirmed, reasoning that requiring plaintiffs to trace the particular funds from the sale of their specific expropriated property to the United States would make the exception a "nullity" in cases involving liquidated property.

*Held*: Alleging commingling of funds alone cannot satisfy the commercial nexus requirement of the FSIA's expropriation exception.   Pp. 126–139.

   (a) The expropriation exception requires plaintiffs to trace either the specific expropriated property itself or "any property exchanged for such property" to the United States (or to the possession of a foreign state instrumentality engaged in United States commercial activity). The provision's plain text treats tangible and fungible property alike: For both kinds of property, plaintiffs must plead some facts that enable the reasonable tracing of the property to the United States.   Thus, when property is expropriated and exchanged for cash that is then commingled with other funds, plaintiffs must still plausibly allege that the specific proceeds from their property have the required commercial connection to the United States.

Syllabus

Plaintiffs might satisfy this requirement in various scenarios: for example, by identifying a United States account holding proceeds from expropriated property (as in *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398), or by showing that a foreign sovereign spent all funds from a commingled account in the United States shortly after the commingling occurred. But an allegation that a foreign sovereign liquidated property decades ago, commingled the proceeds with general funds, and later used some portion of those funds for commercial activities in the United States cannot establish a plausible nexus. This is especially true when commingled funds have been used for various activities worldwide or when the commingled funds are within a foreign sovereign's treasury.

The Court does not today address all circumstances where commingling allegations might contribute to establishing the required nexus, nor does the Court determine the applicability of common-law tracing principles. The Court holds only that commingling allegations alone cannot satisfy § 1605(a)(3)'s commercial nexus requirement. Pp. 126–131.

(b) This interpretation aligns with the FSIA's structure, history, and purpose. The Act generally codifies the restrictive theory of sovereign immunity, which shields foreign states from suits based on public (rather than commercial) acts. Although the FSIA allows claims based on the public act of expropriation, this Court has previously rejected the suggestion that Congress intended the exception to be a "radical departure" from restrictive immunity principles. *Federal Republic of Germany* v. *Philipp*, 592 U. S. 169, 183.

The exception's text mirrors the Second Hickenlooper Amendment, which Congress enacted to permit adjudication of claims after *Sabbatino*. In that case, the expropriated property's proceeds were traceable to a segregated New York account. The FSIA's text requiring identification of specific property, combined with the facts of *Sabbatino*, counsels against respondents' expansive commingling theory.

Additionally, the Court interprets the FSIA to avoid producing friction in international relations or inviting reciprocal actions against the United States in foreign courts. Congress included the commercial nexus requirement and the "in violation of international law" limitation to help ensure the exception would "conform fairly closely" with international law. § 1605(a)(3); *Bolivarian Republic of Venezuela* v. *Helmerich & Payne Int'l Drilling Co.*, 581 U. S. 170, 181. Accepting respondents' theory would expand greatly the circumstances in which foreign sovereigns could be sued in United States courts for public acts, potentially inviting retaliatory measures against the United States. Pp. 131–133.

(c) Respondents' counterarguments are unpersuasive. First they contend that § 1605(a)(3) requires different treatment for fungible versus nonfungible property, but the statute's text draws no such distinction.

Syllabus

The ordinary meaning of "exchanged for" requires identifying the specific property received in the exchange: here, the proceeds from selling the expropriated property. Commingling those proceeds with other funds does not transform the entire commingled account into property "exchanged for" the expropriated property. Indeed, the statute's requirement that property be "present in the United States" reinforces the need to trace specific property, as Congress imposed this geographic constraint for "any" property, including money.

Second, respondents argue that the concerns about tracing raised in *Sabbatino* support their position. But the text of §1605(a)(3), which added the commercial nexus requirement not found in the Second Hickenlooper Amendment, reflects Congress's intent to limit the exception's scope, not expand it. The Second Hickenlooper Amendment itself, moreover, permitted claims based upon a confiscation or "traced through" one. 23 U. S. C. §2370(e)(2).

Finally, respondents contend that rejecting their commingling theory would render the expropriation exception a nullity for liquidated property claims. But the Court does not categorically reject all commingling-based claims: It holds only that a commingling theory alone cannot satisfy the commercial nexus requirement. This holding accords with the statute's text and purpose of providing only a limited departure from the restrictive theory of sovereign immunity. Pp. 133–139.

77 F. 4th 1077, vacated and remanded.

SOTOMAYOR, J., delivered the opinion for a unanimous Court.

*Joshua Scott Glasgow* argued the cause for petitioners. With him on the briefs was *Christopher D. Barraza.*

*Sopan Joshi* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Fletcher, Principal Deputy Assistant Attorney General Boynton, Deputy Solicitor General Kneedler, Sharon Swingle,* and *Lewis S. Yelin.*

*Shay Dvoretzky* argued the cause for respondents. With him on the brief were *Parker Rider-Longmaid, Steven Marcus, Kyser Blakely, Paul G. Gaston, Charles S. Fax, David H. Weinstein,* and *L. Marc Zell.**

―――――――――

*\*Akiva Shapiro* filed a brief for Members of the United States House of Representatives and Senate as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed for the Federal Republic of Germany by *Walter E. Diercks, Max Riederer von Paar,* and *Jeffrey Harris;* and

JUSTICE SOTOMAYOR delivered the opinion of the Court.

To sue a foreign sovereign in the courts of the United States, plaintiffs must follow the strictures of the Foreign Sovereign Immunities Act of 1976 (FSIA). In general, the FSIA provides that foreign sovereigns and their agencies cannot be haled into this Nation's courts at all, but the Act sets forth exceptions to that general immunity. One such exception is the expropriation exception. Plaintiffs may sue foreign sovereigns who expropriate their property, provided certain conditions are satisfied, including that the property (or any property "exchanged for" the expropriated property) has a commercial nexus to the United States. 28 U. S. C. § 1605(a)(3).

Respondents, Jewish survivors of the Hungarian Holocaust and their heirs, filed this suit in the District Court for the District of Columbia against Hungary and one of its agencies, seeking damages for the alleged expropriation of their property during World War II. Respondents maintain that the expropriated property has had a commercial nexus to the United States because the Hungarian defendants liquidated it, commingled the proceeds from that property with money in a government treasury account, and then used, decades later, funds from that account in connection with commercial activity in the United States. The issue presented in this case is whether alleging commingling of funds alone can satisfy the commercial nexus requirement of the expropriation exception of the FSIA. The Court holds that it cannot.

I

A

"This Court consistently has recognized that foreign sovereign immunity 'is a matter of grace and comity on the part

---

for The 1939 Society et al. by *Benjamin G. Shatz*, *Michael J. Bazyler*, *Stanley W. Levy*, and *Stanley Goldman*.

Opinion of the Court

of the United States.'"  *Rubin* v. *Islamic Republic of Iran*, 583 U. S. 202, 208 (2018) (quoting *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 486 (1983)).  For much of the Nation's history, the United States adhered to the "classical" or "absolute" theory of foreign sovereign immunity.  Accordingly, "foreign states were 'generally granted complete immunity from suit' in United States courts."  *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U. S. 428, 434, n. 1 (1989) (alteration omitted).  Providing foreign states with such immunity served important national interests and helped preserve the United States' foreign relations.  See, *e. g.*, *Bolivarian Republic of Venezuela* v. *Helmerich & Payne Int'l Drilling Co.*, 581 U. S. 170, 179 (2017) ("To grant [foreign] sovereign entities an immunity from suit in our courts both recognizes the absolute independence of every sovereign authority and helps to induce each nation state, as a matter of international comity, to respect the independence and dignity of every other, including our own" (internal quotation marks and alteration omitted)).

In 1952, however, the State Department adopted a "restrictive" theory of foreign sovereign immunity, under which a foreign sovereign generally is immune from civil suit for sovereign acts but not for its commercial acts.  See *Verlinden*, 461 U. S., at 486–487.  Based on the "increasing practice on the part of [foreign] governments of engaging in commercial activities," the Department concluded it was "necessary [to have] a practice which will enable persons doing business with them to have their rights determined in the courts."  J. Tate, Changed Policy Concerning the Granting of Sovereign Immunity to Foreign Governments, 26 Dept. State Bull. 984, 985 (1952).  The United States was not alone in adopting the restrictive theory; the Department observed that an emerging consensus had developed among nations in favor of this approach to sovereign immunity.  *Ibid.*

Debates over the degree of immunity foreign sovereigns should enjoy in this Nation's courts followed.  In August

1960, protesting a reduction in the U. S. sugar quota for Cuba, Cuba expropriated $175,250.69 worth of sugar located in its country but belonging to a subsidiary of Compania Azucarera Vertientes-Camaguey de Cuba (CAV), a Cuban corporation owned by American stockholders. See *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 401–407 (1964). Farr Whitlock & Co., a U. S. commodity broker, had contracted with CAV to pay for the sugar in New York for delivery to a Farr Whitlock customer in Morocco; but after Cuba expropriated the sugar, Farr Whitlock entered into an identical contract with an instrumentality of the Cuban Government. See *id.*, at 401–404. Cuba then sent the sugar to Morocco, where Farr Whitlock's customer purchased it. See *id.*, at 405–406.

After receiving payment in New York from its customer, however, Farr Whitlock refused to give the proceeds to Cuba. See *ibid.* CAV had claimed it was the rightful owner of the sugar, entitling it to the related proceeds, and agreed to indemnify Farr Whitlock in return for a promise not to turn the funds over to Cuba. See *ibid.* Shortly thereafter, the New York Supreme Court served Farr Whitlock with an order enjoining it from taking any action that might result in the proceeds leaving New York. See *ibid.* Then, pursuant to a subsequent court order, Farr Whitlock transferred the proceeds to Sabbatino, a court-appointed temporary receiver of CAV's New York assets, pending a judicial determination of the funds' ownership. See *ibid.*

The National Bank of Cuba later brought suit in the Southern District of New York, asserting its ownership in the proceeds. *Id.*, at 406. Following a decision by the Court of Appeals, the State Supreme Court terminated the CAV receivership and the proceeds from the expropriated sugar were placed in a New York escrow account. See *id.*, at 407.

The matter eventually reached this Court. The Court declined to decide whether Cuba's expropriation had violated international law. Observing that there were "few if any

issues in international law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property of aliens," *id.*, at 428, the Court instead invoked the "act of state" doctrine. That doctrine (the Court held) precludes United States courts from deciding the validity of a foreign sovereign's public acts. See *id.*, at 436–437. The Court thus "presumed [the] validity" of Cuba's expropriation. *Id.*, at 439. In dissent, Justice White protested that the Court's holding effectively "validate[d]" Cuba's "lawless act." *Ibid.*

Congress swiftly signaled its disapproval of *Sabbatino*. Within months, it passed the Second Hickenlooper Amendment to the Foreign Assistance Act of 1964. The amendment prohibits courts from applying the act of state doctrine where a "righ[t] to property is asserted" based upon a "taking . . . by an act of that state in violation of the principles of international law." 22 U. S. C. §2370(e)(2). The amendment was broadly understood "to permit adjudication of claims the *Sabbatino* decision had avoided." *Federal Republic of Germany* v. *Philipp*, 592 U. S. 169, 179 (2021) (collecting authorities).

There the law remained, until in 1976, Congress enacted the FSIA, the comprehensive statute that now "supplies the ground rules for 'obtaining jurisdiction over a foreign state in the courts of this country.'" *Id.*, at 175 (quoting *Amerada*, 488 U. S., at 443). The Act provides foreign states with presumptive immunity from suit in the United States. 28 U. S. C. §1604. Thus, "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia* v. *Nelson*, 507 U. S. 349, 355 (1993) (citing *Verlinden*, 461 U. S., at 488–489). "For the most part, the Act codifie[d], as a matter of federal law, the restrictive theory of sovereign immunity." *Id.*, at 488.

One of the FSIA's specified exceptions, however, departs from the restrictive theory: the expropriation exception.

§ 1605(a)(3).    In crafting the exception addressing the expropriation of property, "Congress used language nearly identical to that of the Second Hickenlooper Amendment."    *Philipp*, 592 U. S., at 179.    But Congress also added a limitation to the expropriation exception not found in the Second Hickenlooper Amendment: While the amendment permits claims "based upon (or traced through) a confiscation or other taking," 22 U. S. C. § 2370(e)(2), the expropriation exception requires that stolen property, or property exchanged for such property, have a commercial nexus to the United States. Specifically, § 1605(a)(3) allows individuals to sue foreign sovereigns in United States courts when "rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state." Section 1605(a)(3) also allows suit when "that [expropriated] property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."

By permitting the exercise of jurisdiction over certain public acts, "the expropriation exception . . . goes beyond even the restrictive view" in subjecting foreign sovereigns to suit.    *Philipp*, 592 U. S., at 183.    As this Court has previously noted, it appears that "no other country has adopted a comparable limitation on [foreign] sovereign immunity." *Ibid.*

B

The allegations in respondents' complaint arise out of the Hungarian Holocaust.    According to their complaint, Winston Churchill described the Hungarian Holocaust as "'probably the greatest and most horrible crime ever committed in the history of the world.'"    App. 6.    During World War II, Hungary abetted the murder of over 500,000 Hungarian

Jews, leaving just a fraction of Hungary's prewar Jewish population. *Id.*, at 49. "Nowhere was the Holocaust executed with such speed and ferocity as it was in Hungary." *Id.*, at 5.

Hungary's genocidal campaign included the mass confiscation of Jewish property. Per respondents' complaint, officials from Hungary's national railway, the Magyar Államvasutak Zrt. (MÁV), robbed Hungarian Jews of their possessions before transporting them to Nazi death camps. *Id.*, at 40–41. The Hungarian Government, moreover, "declared all valuable objects owned by Jews—except for their most personal items—part of the national wealth of Hungary." *Simon* v. *Republic of Hungary*, 77 F. 4th 1077, 1090 (CADC 2023) (*Simon III*).

Respondents are a group of Jewish survivors of the Hungarian Holocaust and their heirs who seek damages for a variety of claims, including, *inter alia*, conversion, unjust enrichment, civil conspiracy to commit tortious acts, and aiding and abetting the conversion of their property, based on Hungary and MÁV's alleged seizure of their property. They claim that Hungary, after seizing their property, liquidated it and deposited the proceeds in the Hungarian treasury. There the funds became commingled with other Hungarian Government funds, money Hungary has since used for a wide variety of governmental and commercial operations. Respondents' complaint further alleges that MÁV also liquidated the property it expropriated and deposited the proceeds into commingled accounts that it owns today and has used for a wide range of transactions.

In the 2000s, Hungary allegedly used funds from its treasury to issue bonds in the United States and to purchase military equipment here. See 579 F. Supp. 3d 91, 107–108 (DC 2021). MÁV also engages in commercial activity in the United States, including by maintaining an agency here that sells tickets, books reservations, and conducts similar business. *Ibid.*

C

In 2010, respondents sued Hungary and MÁV, seeking compensation for the seizure of their property during the Holocaust. The procedural history of this case is lengthy. It includes several appeals to the D. C. Circuit. See *Simon* v. *Republic of Hungary*, 812 F. 3d 127 (CADC 2016) (*Simon I*); *Simon* v. *Republic of Hungary*, 911 F. 3d 1172 (2018) (*Simon II*); *Simon III*, 77 F. 4th 1077. When the case previously reached this Court, we vacated the judgment in *Simon II* and remanded the case for further proceedings consistent with our decision in *Philipp*, 592 U. S., at 172. See *Republic of Hungary* v. *Simon*, 592 U. S. 207 (2021) (*per curiam*).

As relevant here, respondents allege that Hungary and MÁV are subject to the jurisdiction of United States courts under the expropriation exception. To satisfy § 1605(a)(3)'s commercial nexus requirement, respondents rely on a "commingling theory": They "alleg[e] that the Hungarian defendants liquidated the[ir] stolen property, mixed the resulting funds with their general revenues, and devoted the proceeds to funding various governmental and commercial operations." *Simon I*, 812 F. 3d, at 147. Those commingled funds, respondents maintain, were once "exchanged for" their expropriated property and are now "property . . . present in the United States in connection with a commercial activity carried on in the United States by" Hungary. § 1605(a)(3). Among other things, Hungary allegedly used commingled funds to issue bonds and purchase military equipment in the United States in the 2000s; and MÁV allegedly still "own[s]" the same commingled funds. See 579 F. Supp. 3d, at 107–109; see also § 1605(a)(3) (permitting suit when "[expropriated] property or any property exchanged for such property is *owned* . . . by an agency . . . of the foreign state and that agency . . . is engaged in a commercial activity in the United States" (emphasis added)).

Opinion of the Court

Following this Court's remand on an unrelated question, the District Court reaffirmed a prior determination that respondents' commingling theory satisfied the commercial nexus element of § 1605(a)(3). *Id.*, at 122, n. 22. The D. C. Circuit affirmed. It rejected Hungary's assertion that respondents needed to "'produce evidence tracing property in the United States or possessed by MÁV to property expropriated from them during World War II.'" 77 F. 4th, at 1118. Instead, the court concluded that Congress, by including the phrase "'*or any property exchanged for such property*'" in the expropriation exception, intended to cover circumstances in which a foreign state converts stolen property into cash and commingles the cash with other funds. *Ibid.*

The court reasoned, moreover, that "[r]equiring plaintiffs whose property was liquidated to allege and prove that they have traced funds in the foreign state's or instrumentality's possession to proceeds of the sale of their property would render the FSIA's expropriation exception a nullity for virtually all claims involving liquidation" of property. *Ibid.* "Given the fungibility of money," the court explained, "once a foreign sovereign sells stolen property and mixes the proceeds with other funds in its possession, those proceeds ordinarily become untraceable to any specific future property or transaction." *Ibid.* The D. C. Circuit "decline[d] to ascribe to Congress an intent to create a safe harbor for foreign sovereigns who choose to commingle rather than segregate or separately account for the proceeds from unlawful takings." *Ibid.*

The Court granted certiorari, 602 U. S. 1038 (2024), to decide "[w]hether historical commingling of assets suffices to establish that proceeds of seized property have a commercial nexus with the United States under the expropriation exception to the Foreign Sovereign Immunities Act," Pet. for Cert. ii.

## II

### A

To establish federal jurisdiction under the expropriation exception, plaintiffs must allege facts sufficient to raise a plausible inference that either their property, or "any property exchanged for such property," is "present in the United States in connection with a commercial activity carried on in the United States by" the foreign sovereign, or that those belongings are "owned or operated by" a foreign state agency "engaged in a commercial activity in the United States."[1]  § 1605(a)(3).

As a general matter, respondents agree, § 1605(a)(3) tasks plaintiffs with identifying specific property, or particular property exchanged for that property, "present in the United States in connection with a commercial activity . . . by the

_____

[1] In their petition for certiorari, Hungary and MÁV asked this Court to answer two additional questions.  First is whether this Court's decision in *Bolivarian Republic of Venezuela* v. *Helmerich & Payne Int'l Drilling Co.*, 581 U. S. 170 (2017), displaced the typical plausibility pleading standard, for actions brought under the FSIA, with a heightened standard for factual allegations.  Pet. for Cert. ii.  It is unnecessary to resolve this question, however, because the commingling theory cannot satisfy the lower of these two standards.  The Court thus assumes without deciding that the plausibility pleading standard applies here.

Hungary and MÁV's second additional question concerns who bears the burden of production to prove (or disprove) that expropriated property has a commercial nexus with the United States.  *Ibid.*  The Government asks the Court to answer a related question: Who bears the burden of *persuasion* on that issue.  Brief for United States as *Amicus Curiae* I. The Court declines to answer either question.  The parties agree that respondents bear the burden of production.  See Brief for Petitioners 39; Brief for Respondents 37–38.  And it is unnecessary to resolve who bears the ultimate burden of persuasion because that question arises only after a plaintiff has pleaded adequately that § 1605(a)(3)'s commercial nexus is satisfied, which respondents have not done here with their commingling allegations.

foreign state," or owned by a foreign state agency engaged in commercial activity in the United States. *Ibid.* Specifically, plaintiffs must identify either the expropriated property itself ("that property") or "any property exchanged for such property." *Ibid.* Doing so inevitably requires that plaintiffs show a tracing of some sort that explains the property's lineage and how it found itself in the United States (or in the possession of a foreign sovereign agency that does commercial activity here).

When the property at issue is tangible expropriated property itself, a plaintiff must allege some facts that give rise to a plausible inference that the property is in the United States. Suppose a foreign sovereign expropriates and retains for its collection a piece of art from a plaintiff. To bring suit under § 1605(a)(3), the plaintiff would have to put forth some facts that support tracing that artwork to a location in the United States or to the possession of an agency of the sovereign with commercial activities in the United States. A complaint would fail if it instead identified another unrelated artwork expropriated by the foreign state, even if that other artwork had the requisite commercial nexus to the United States. No one disputes that the phrase "*that* property" in § 1605(a)(3) refers only to the specific piece of property taken from the plaintiff.

As respondents recognize, the same tracing requirement would exist if the foreign sovereign were to exchange the plaintiff's artwork for another tangible item. Brief for Respondents 42–43. For example, suppose that the sovereign trades the expropriated artwork for a different piece of art. That transaction would not extinguish the plaintiff's ability to sue: the other piece of art is, of course, property, and § 1605(a)(3) permits suit based on "*any* property exchanged" for the expropriated property. (Emphasis added.) If the plaintiff alleges facts sufficient to reasonably conclude that the different piece of art can be traced to the United States,

§ 1605(a)(3)'s commercial nexus is satisfied. The plaintiff could not merely allege, however, that the foreign sovereign maintains an art collection in the United States. Nor would it be sufficient for the plaintiff to allege that the collection includes other art that is comparable to the exchanged-for piece of art. Section 1605(a)(3)'s use of "*exchanged* for" means the only relevant art is the one the foreign sovereign received in return for the plaintiff's original artwork. *Ibid.*; see also American Heritage Dictionary 457 (1975) (defining "exchange" as "[t]o relinquish (one thing for another)").

Respondents' commingling theory accepts all this, but posits an exception to the statute's tracing requirement that applies only when a foreign sovereign converts expropriated property into money or other fungible property. According to the commingling theory, if a foreign sovereign exchanges expropriated property for money, a plaintiff need not identify the specific funds for which their property was exchanged. Instead, respondents claim, a plaintiff need only identify *any* fund that was, at any time, no matter how remote, commingled with the proceeds of the foreign sovereign's sale of the expropriated property. This commingling theory thus does away with the tracing requirement implicit in the phrase "exchanged for" within § 1605(a)(3).

Section 1605(a)(3) contains no such exception. The plain text of the expropriation exception treats all "property" alike, whether that property is tangible (like a piece of art) or fungible (like cash). Thus, if instead of exchanging the expropriated artwork for another piece of art, the foreign sovereign sells it and deposits the cash proceeds into a bank account used for commercial activities, that mere fact does not relieve plaintiffs from alleging some facts that enable the reasonable tracing of those proceeds to the United States.

As *Sabbatino* shows, one way a plaintiff can do so is by identifying an account within the United States that holds the proceeds from the sale of seized property. Similarly, a plaintiff might satisfy § 1605(a)(3)'s commercial nexus by al-

leging that a foreign sovereign, soon after commingling funds from the sale of expropriated property, spent all the funds from the commingled account in the United States as part of its commercial activity here. It would follow that the proceeds connected to the expropriated property would likely be present in the United States. The same would be true if the amount of commingled funds spent exceeds the amount of the funds in the account unrelated to the alleged expropriation. Put another way, suppose a foreign sovereign expropriates property and sells it for $1 million. If the foreign state then deposits those proceeds into an account containing $250,000 in other funds and immediately spends $500,000 of the commingled funds for a commercial transaction in the United States, a plaintiff could rely on those facts to satisfy §1605(a)(3)'s commercial nexus. Those facts would establish that (at least) $250,000 of the $1 million proceeds "exchanged for" the expropriated property is "present in the United States." §1605(a)(3).[2] These are merely examples of how the tracing requirement might be met.

A plaintiff does not make the necessary showing, however, by alleging only that the foreign sovereign deposited the proceeds from the sale of expropriated property into an account at some time and eventually used that account for commercial activity in the United States. That is because an allegation of commingling alone does not give rise to a plausible inference that the specific property "exchanged for" the expropriated property, *i. e.*, the cash proceeds from the sale, is "present in the United States." *Ibid.* To the contrary, it will typically be indeterminate whether an expenditure of commingled funds includes any of the proceeds connected to the expropriated property. Commingling allegations are therefore not enough on their own because they do not allow

———————

[2] The proximity in time between a foreign sovereign's commingling of proceeds from expropriated property with other money and its expenditure of those commingled funds in the United States for commercial activity may also be a relevant consideration in assessing whether a plaintiff has satisfied §1605(a)(3)'s commercial nexus.

for plausible tracing of specific funds. To conclude otherwise requires accepting an attenuated fiction that commingling funds in an account, even if done decades earlier, means the account today still contains funds attributable to the sale of expropriated property.

The problem with such a fiction becomes especially clear when a foreign sovereign has used commingled funds not just for commercial activities in the United States but also for commercial and governmental operations all over the world, as is the case here. App. 33 (alleging that Hungary "liquidated stolen property, mixed the resulting funds with their general revenues, and devoted the proceeds to funding various governmental and commercial operations"). In such circumstances, it is no more likely that the funds related to the expropriated property ended up in the United States than that they ended up anywhere else in the world or remained in Hungary. That is especially true when the commingled funds are within a foreign sovereign's treasury, given that old and new revenues flow in and out of the treasury in massive quantities over time. Thus, commingling allegations alone cannot plausibly establish that any of the relevant proceeds from expropriated property are in the United States.

All this is not to say that, once funds are commingled, plaintiffs will never be able to satisfy § 1605(a)(3). As previously noted, there are scenarios in which a plaintiff might satisfy § 1605(a)(3)'s commercial nexus requirement when expropriated property has been exchanged for cash and that cash has been commingled with other funds. *Supra*, at 128. The Court does not today purport to identify all circumstances in which commingling allegations may be part of broader allegations that collectively satisfy § 1605(a)(3)'s commercial nexus. Instead, the Court holds only that an allegation that a foreign sovereign liquidated expropriated property, commingled the proceeds with other funds, and then used some of those commingled funds for commercial

activities in the United States (or that a foreign instrumentality retained such proceeds and then commingled them with other funds) cannot itself establish the required commercial nexus of § 1605(a)(3).

Because respondents have disclaimed in this case the utility of common-law tracing principles and rules from other contexts, Tr. of Oral Arg. 76, we leave for another day the extent to which they may prove helpful to courts tasked with determining whether a plaintiff has satisfied § 1605(a)(3)'s commercial nexus when expropriated property has been liquidated and commingled. Cf. *Luis* v. *United States*, 578 U. S. 5, 22 (2016) (plurality opinion) (referring to "tracing rules governing commingled accounts" in the trust-law context and citing 4 A. Scott, Law of Trusts § 518 (1956)). Courts should not import reflexively those principles and rules into this context, however, given the baseline presumption of foreign sovereign immunity. Any application of existing tracing principles and rules must be consistent with the overall FSIA scheme and the expropriation exception's requirements.

B

This interpretation of § 1605(a)(3) is further consistent with the FSIA's structure, history, and purpose. As a general matter, litigants cannot sue foreign sovereigns in United States courts. The FSIA "creates a baseline presumption of immunity from suit." *Philipp*, 592 U. S., at 176; see 28 U. S. C. § 1604. To the extent the Act permits litigation against foreign states, it usually requires that the litigation be premised on the foreign state's private, commercial conduct. That is because the FSIA "'largely codifies' the restrictive theory" of sovereign immunity, which shields foreign states from being sued for their public acts. *Philipp*, 592 U. S., at 183. Courts should "take seriously the Act's general effort to preserve a dichotomy between private and public acts." *Ibid.*

Although § 1605(a)(3) allows plaintiffs to bring suit based on the public act of expropriation, this Court has previously "reject[ed] the suggestion that Congress intended the expropriation exception to operate as a 'radical departure' from the 'basic principles' of the restrictive theory." *Id.*, at 183 (quoting *Helmerich*, 581 U. S., at 181). Yet reading § 1605(a)(3) as broadly as respondents do would undermine those principles by expanding greatly the circumstances in which foreign sovereigns can be brought into United States courts for their public acts.

Moreover, Congress drafted the expropriation exception "against th[e] legal and historical backdrop" that includes not only the restrictive theory but also *Sabbatino. Philipp*, 592 U. S., at 181. Recall that the text of § 1605(a)(3) mirrors, in part, that of the Second Hickenlooper Amendment, which Congress enacted "to permit adjudication of claims the *Sabbatino* decision had avoided." *Id.*, at 179. In *Sabbatino*, "the proceeds . . . in controversy" could be traced to a New York account that contained segregated funds attributable only to the sale of expropriated sugar. 376 U. S., at 401. The facts of *Sabbatino*, along with the FSIA's plain text requiring identification of distinct property seized, or specific property exchanged for that property, with a commercial nexus to the United States, counsel against the commingling theory alone satisfying § 1605(a)(3)'s commercial nexus.

There is further good reason for the Court not to read § 1605(a)(3) so broadly as to permit a commingling theory alone: the United States' "reciprocal self-interest" in receiving sovereign immunity in foreign courts. *National City Bank of N. Y.* v. *Republic of China*, 348 U. S. 356, 362 (1955). This Court "interpret[s] the FSIA as we do other statutes affecting international relations: to avoid, where possible, 'producing friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation.'" *Philipp*, 592 U. S., at 184 (quoting *Helmerich*,

581 U. S., at 183; alteration in original). Although the expropriation exception is "unique" in how it departs from the restrictive theory, *Philipp*, 592 U. S., at 183, its drafters understood it to "'conform fairly closely'" with international law, *Helmerich*, 581 U. S., at 181; *ibid.* (observing that "this Court, like Congress, has paid special attention" to the Government's "views on sovereign immunity"). That is why the exception requires a commercial nexus with the United States and a taking of property "in violation of international law." § 1605(a)(3). By including this language, Congress hoped it "would diminish the likelihood that other nations would each go their own way, thereby 'subject[ing]' the United States 'abroad' to more claims 'than we permit in this country.'" *Id.*, at 181 (quoting Hearing on H. R. 3493 before the Subcommittee on Claims and Governmental Relations of the House of Representatives Committee on the Judiciary, 93d Cong., 1st Sess., 18 (1973) (alteration in original)).

If respondents' commingling theory were accepted, § 1605(a)(3) would impose a far greater limitation on foreign sovereign immunity, expanding the set of circumstances in which foreign sovereigns could be sued in United States courts for public acts involving expropriation. The Government represents that this would invite the very risk it sought to avoid in helping draft § 1605(a)(3): that foreign states, in response, will subject the United States abroad to "retaliatory or reciprocal actions" in their courts. Tr. of Oral Arg. 31. The Court declines to interpret § 1605(a)(3) in the expansive manner that respondents seek.

## III

### A

Respondents do not resist that the plain text of § 1605(a)(3) requires plaintiffs to identify and trace their specific expropriated property, or the particular property exchanged for their expropriated property, to the United States (or to the possession of a foreign instrumentality that does commercial

activity here) when the property in question is nonfungible. Yet respondents insist that the same statutory text does not require similar tracing when the expropriated property is converted into cash. Instead, respondents maintain, § 1605(a)(3) is best read to support their commingling theory in those circumstances. That argument is unpersuasive.

Respondents start from the undisputed premise that money is property. From there, respondents argue that money can be the "any property" that is "exchanged for" expropriated property. § 1605(a)(3). If a foreign sovereign then commingles proceeds from the sale of expropriated property with other funds, respondents explain, the proceeds do not lose their status as the property that was "exchanged for" the expropriated property. Thus, according to respondents, when those commingled funds enter the United States in connection with a foreign state's commercial activities (or enter the possession of a foreign agency that does commercial activities in the United States), the commercial nexus is satisfied because the commingled funds came from an account where the expropriated proceeds were deposited. No further tracing is required, they insist, because money is fungible. This fungibility means any given dollar of the proceeds in an account is indistinguishable from, and thus exchangeable with, any dollar in the commingled account.

Section 1605(a)(3)'s text does not support this theory. For one, the expropriation exception does not draw any distinctions between nonfungible and fungible property. Nothing in the text of § 1605(a)(3) establishes distinct tracing requirements for the latter. Moreover, respondents' commingling theory distorts the ordinary meaning of "exchange." When a foreign sovereign sells expropriated property, the cash proceeds it gets in return is the relevant property for purposes of § 1605(a)(3). This is because those proceeds were "exchanged for" the expropriated property, and it is this property a plaintiff must show is in the United States. The other money in a foreign sovereign's possession is irrelevant.

Just as a foreign sovereign's art collection in the United States would be if it does not contain a plaintiff's specific expropriated artwork or a piece of art exchanged for that artwork.

Respondents do not argue that a foreign state's cash reserves, if kept separate from proceeds of the sale of expropriated property, can qualify as "property exchanged for" expropriated property. Nor could they: That separate cash bears no relationship to the expropriated property. That a foreign sovereign may instead commingle expropriated proceeds with other unrelated funds does not change that conclusion. The only property the sovereign received in "exchange" for the expropriated property is the cash proceeds it received in that transaction. Yet the commingling theory requires accepting the idea that the entire account with commingled funds should be regarded as property "exchanged for" the expropriated property, even if that account's assets far outweigh what the foreign sovereign received for selling the expropriated property.

The facts of this case underscore why this commingling theory is inconsistent with the ordinary meaning of "exchanged for." Respondents allege that Hungary used general treasury funds to issue bonds and purchase military equipment in the United States in the 2000s. That expenditure, respondents maintain, permits their suit to proceed under § 1605(a)(3) because Hungary allegedly expropriated their property during World War II, liquidated it, and then commingled the proceeds with government funds. In the intervening decades, however, Hungary has made countless transactions throughout several institutional collapses and regime changes, resulting in billions in revenues flowing in and out of its treasury. Against this historical backdrop, it is implausible to say that the commingling Hungary did in the 1940s, on its own, establishes that the money it spent in the United States in the 2000s was "exchanged for" the property Hungary allegedly expropriated from respondents.

The same is true for the assertion that any of MÁV's current possessions were "exchanged for" respondents' property based solely on the fact that it allegedly liquidated respondents' property in the 1940s and then commingled the proceeds with its general revenues, given that MÁV has used those commingled funds in the intervening decades for countless transactions as well. To say otherwise stretches "exchange" to the point of breaking.

It is true that, because money is fungible, it will likely be difficult to trace cash from the sale of expropriated property after it is commingled. Section 1605(a)(3), however, contains a further textual indication that reinforces its requirement of tracing specific property: When a foreign sovereign is responsible for the expropriation, a suit may proceed only if the property is "present in the United States." Congress was well aware that the location of money can become indeterminate when it is commingled, but it nonetheless imposed this geographic constraint for "*any*" property, including money. *Ibid.* (emphasis added); cf. 21 U. S. C. §§ 853(p)(1)(E), (2) (in the criminal forfeiture context, permitting seizure of "any other property of the defendant" when property "has been commingled with other property which cannot be divided without difficulty").

## B

Respondents next argue that the concerns this Court raised in *Sabbatino* about tracing expropriated property helps their position. For instance, the Court observed that "one would have difficulty determining after goods had changed hands several times whether the particular articles in question were the product of" expropriation. 376 U. S., at 434. The Court also mentioned specifically the "difficult tas[k] of ascertaining the origin of fungible goods." *Ibid.*, n. 39. Congress nevertheless enacted the Second Hickenlooper Amendment with those observations in mind, and

later passed the expropriation exception, which has language nearly identical to that of the Second Hickenlooper Amendment. According to respondents, those actions reflect Congress's intent to allow the adjudication of expropriation claims generally, including those premised on a commingling theory.

It is the statutory text of §1605(a)(3) that best reflects Congress's intent, however, and it does not support respondents' commingling theory for the reasons discussed. Indeed, the expropriation exception permits only claims that show a commercial nexus between expropriated property (or property exchanged for that property) and the United States, a requirement not found in the Second Hickenlooper Amendment. Moreover, the Second Hickenlooper Amendment allows claims "based upon (*or traced through*) a confiscation or other taking," 22 U. S. C. §2370(e)(2) (emphasis added), underscoring the importance of alleging some facts that enable the reasonable tracing of property to the United States, in the §1605(a)(3) context, when claims identify "property *exchanged* for [expropriated] property," 28 U. S. C. §1605(a)(3) (emphasis added). Thus, the expropriation exception's roots in *Sabbatino* and the Second Hickenlooper Amendment do not provide a compelling reason to abandon the plain meaning of §1605(a)(3).[3]

---

[3] Contrary to respondents' assertions, moreover, the Second Hickenlooper Amendment was contemporaneously understood by courts to permit adjudication of claims involving "specific and identifiable and 'traceable' property." *French* v. *Banco Nacional de Cuba*, 23 N. Y. 2d 46, 61, 242 N. E. 2d 704, 714 (1968); see *id.*, at 58, 242 N. E. 2d, at 712 (observing that the amendment was "restricted, manifestly, to the kind of problem exemplified by the *Sabbatino* case itself, a claim of title or other right to *specific* property which had been expropriated abroad" (emphasis added)); see also *Hunt* v. *Coastal States Gas Prod. Co.*, 583 S. W. 2d 322, 330, n. 6 (Tex. 1979) ("Although the amendment does not refer specifically to proceeds, it is clear that it was intended to apply to the property as long as it is traceable").

### C

Lastly, respondents argue from purpose. Like the D. C. Circuit, they maintain that §1605(a)(3) will be rendered a nullity if the commingling theory alone cannot plausibly establish a commercial nexus with the United States. The commingling theory is necessary, they insist, because without it, foreign sovereigns can "commingle the proceeds from illegally taken property with general accounts" and thereby "insulate [themselves] from suit [in the United States] under the expropriation exception." 77 F. 4th, at 1118.

The Court's decision, however, does not categorically reject claims premised on a commingling theory. The Court holds only that a commingling theory cannot satisfy §1605(a)(3)'s commercial nexus on its own. It is true that it will be harder for plaintiffs to satisfy §1605(a)(3)'s commercial nexus element when a foreign sovereign expropriates property in violation of international law and liquidates it if they cannot rely on a commingling theory alone. This added difficulty in bringing some §1605(a)(3) claims, though, does not make the expropriation exception a dead letter for the reasons explained. *Supra*, at 128–131.

Respondents' policy concerns, moreover, cannot "'surmount the plain language of the statute,'" *Truck Insurance Exchange* v. *Kaiser Gypsum Co.*, 602 U. S. 268, 284 (2024) (quoting *Arthur Andersen LLP* v. *Carlisle*, 556 U. S. 624, 629 (2009)), especially given countervailing ones that better conform to the plain text. Allowing plaintiffs to forgo altogether the statute's tracing requirements by pleading a commingling theory could allow vastly more suits to proceed under §1605(a)(3), even though the expropriated property would have an attenuated nexus to the United States. This could, in turn, undermine the United States' foreign relations and reciprocal self-interest, as well as §1605(a)(3)'s conformity with international law. As discussed, the Government helped craft §1605(a)(3) expressly to avoid that outcome,

*supra*, at 132–133, and Congress intended for § 1605(a)(3) to operate as only a limited departure from the restrictive theory, which provides foreign sovereign immunity for public acts like expropriation.

*        *        *

Ultimately, today's decision concerns only what plaintiffs must plead to bring suit against foreign sovereigns for their actions abroad in the courts of the United States. That a particular claim cannot satisfy the expropriation exception means only that it cannot be brought here, not that it cannot be brought in any forum. As the Government correctly recognizes, "the moral imperative has been and continues to be to provide some measure of justice to the victims of the Holocaust, and to do so in their remaining lifetimes." Brief for United States as *Amicus Curiae* 26. The Government also represents, however, that "[r]especting the limits in the FSIA aids in the United States' efforts to persuade foreign nations to establish appropriate redress and compensation mechanisms for human-rights violations, including the horrendous human-rights violations perpetrated during the Holocaust." *Ibid.*

For the foregoing reasons, the Court concludes that a commingling theory, without more, cannot satisfy the commercial nexus requirement of § 1605(a)(3). The judgment of the Court of Appeals for the D. C. Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

### Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None